**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| John Dominici | : | |
| | : | |
| v. | : | No. 3:04cv1584 (JBA) |
| | : | |
| Between the Bridges Marina | : | |

## RULING ON DEFENDANT'S MOTION TO DISMISS [DOC. # 12]

Plaintiff John Dominici alleges that his boat was vandalized and sank while in the custody and care of defendant Between the Bridges Marina ("BTB").  Defendant removed plaintiff's suit from state court under the Court's original admiralty and maritime jurisdiction, and now moves to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on grounds that the parties' storage contract exculpates BTB from any liability for damage to plaintiff's vessel.  For the reasons that follow, defendant's motion is denied.

## I.  Background

Plaintiff John Dominici was the owner of a 1975 Betram 46 Foot Off Shore Fly Bridge Sport Fisherman boat named the "Irish Mist."  Complaint [Doc. # 1] at First Count, ¶ 1.  He entered into a written agreement with defendant BTB on September 23, 2003 for the winter storage of his boat, paying BTB $1,104 for the storage.  Id. at ¶ 3.  On October 18, 2003, Dominici delivered his boat to defendant's marina, and was told that it would be hauled out of the water and stored within a day or so.  Id. at ¶

1

4.   At some time between October 18 and October 29, 2003,

however, plaintiff's boat was vandalized, and sank.  Id. at ¶ 5.

Plaintiff alleges that BTB was negligent, and breached the

storage contract, in failing to timely haul and store his boat,

failing to properly inspect and maintain the marina so as to

prevent vandals from causing damage to vessels within BTB's

custody and control, failing to properly secure his boat and

personal property from damage and loss, and failing to warn the

plaintiff of the insecure conditions.  Id. at First Count ¶ 6,

Second Count ¶ 5.

The Winter Storage Contract between Dominici and BTB,

incorporated by reference in plaintiff's complaint and attached

to defendant's motion to dismiss, provides:

> INSURANCE: TENANT agrees that he will keep the boat fully
> insured with complete marine insurance, including hull
> coverage and indemnity and/or liability.  THE LANDLORD DOES
> NOT CARRY INSURANCE covering the property of the TENANT.
> THE LANDLORD WILL NOT BE RESPONSIBLE for any injuries or
> property damage resulting, caused by, or growing out of the
> use of the dock or harbor facilities; that the TENANT
> RELEASES ANS [sic] DISCHARGES THE LANDLORD from any and all
> liability from loss, injury (including death), or damages to
> persons or property sustained while in or on the facilities
> of LANDLORD, including fire, theft, vandalism, windstorm,
> high or low waters, hail, rain, ice, collision or accident,
> or any other Act of God, whether said boat is being parked
> or hauled by an AGENT of LANDLORD or not.

Winter Storage Contract [Doc. # 14, Ex. 2] at ¶ 18.

Based on this clause, defendant argues that it cannot be

held liable for the losses plaintiff has sustained.  Plaintiff,

however, contends that the clause is unenforceable on public

2

policy grounds, and because he received no notice of the contract terms at issue.

## II.   Standard

When deciding a 12(b)(6) motion to dismiss, the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the pleader.  Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).  A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513-14 (2002); Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.  Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

## III.   Discussion

Whether the exculpatory clause in BTB's Winter Storage Contract fully absolves BTB from all liability for its own negligence, and if so, whether it is enforceable, implicates this Court's admiralty jurisdiction, which extends to "all contracts . . . which relate to the navigation, business, or commerce of the sea," Atlantic Mutual Ins. Co. v. Balfor Maclaine Int'l, Ltd.,

968 F.2d 196, 199 (2d Cir. 1992), and requires application of the federal body of maritime law.  See East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 864 (1986) ("With admiralty jurisdiction comes the application of substantive admiralty law.  Absent a relevant statute, the general maritime law, as developed by the judiciary, applies. Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules.") (citations omitted); La Esperanza de P.R., Inc. v. Perez y Cia de P.R., Inc., 124 F.3d 10, 16 (1st Cir. 1997) ("[A]dmiralty jurisdiction brings with it a body of federal jurisprudence, largely uncodified, known as maritime law."); Sander v. Alexander Richardson Invs., 334 F.3d 712 (8th Cir. 2003).

All circuits to address this issue are in agreement that the intent to fully exonerate a party from its own negligence must "be clearly and unequivocally expressed."  Sander, 334 F.3d at 715 (8th Cir. 2003) (quoting Randall v. Chevron U.S.A., Inc., 13 F.3d 888, 905 (5th Cir. 1994)); see also Edward Leasing Corp. v. Uhlig & Assocs., Inc., 785 F.2d 877, 889 (11th Cir. 1986); M/V Am. Queen v. San Diego Marine Const. Corp., 708 F.2d 1483, 1488 (9th Cir. 1983).  There is a split of authority, however, as to whether such agreements are enforceable, and the Second Circuit has not addressed the issue.

## A.   Scope of the Exculpatory Clause

While the exculpatory clause in BTB's Winter Storage

Contract did not expressly absolve BTB of liability for its own

negligence, the import of the clause is clear and unequivocal.

The clause "releases ans [sic] discharges the LANDLORD from <u>any</u>

<u>and all</u> liability from loss, injury (including death), or damages

to persons or property sustained while in or on the facilities of

the LANDLORD, including . . . vandalism . . . whether said boat

is being parked or hauled by an Agent of LANDLORD or not."

Winter Storage Contract [Doc. # 14, Ex. 2] at ¶ 18 (emphasis

added).  The clause's broad absolution of "any and all

liability," specific reference to vandalism, as is at issue here,

and implication that the limitation of liability holds even where

the boat is in the care or custody of BTB or its agents, together

plainly encompass liability arising from the marina's own

negligence.  Examining an exculpatory clause nearly identical to

BTB's,[1] the Eighth Circuit in <u>Sander</u>, 334 F.3d at 716, reversed

---

[1] The exculpatory clause at issue in <u>Sander</u> provided:

> 19.   INSURANCE: TENANT AGREES that he will keep the
> boat fully insured with complete marine insurance,
> including hull [property] coverage and indemnity
> and/or liability insurance.  THE LANDLORD DOES NOT
> CARRY INSURANCE covering the property of the
> TENANT.  THE LANDLORD WILL NOT BE RESPONSIBLE for
> any injuries or property damage resulting, caused
> by or growing out of the use of the dock or harbor
> facilities; that the TENANT RELEASES AND
> DISCHARGES THE LANDLORD from any and all liability
> from loss, injury (including death), or damages to

recovery granted to plaintiff boat owners for fire damage to
their boats caused by the marina's negligence, because "the
clause releasing the Yacht Club 'from <u>any and all</u> liability for .
. . damages to . . . property . . ., including fire,'
unambiguously released it from liability stemming from its own
negligence."  As the circuit court reasoned, "[t]he slip
agreement clearly shifted the risk of loss to the boat owners by
requiring the boat owners to fully insure their boats, including
hull coverage.  The agreement informed the boat owners in capital
letters that the marina did not carry insurance that would cover
the property of the boat owners.  The term 'any and all' used in
the exculpatory clause is all-encompassing and leaves little
doubt as to the liability from which the boat owners released the
Yacht Club."  <u>Id</u>.   As in <u>Sander</u>, the contract here is clear in
its shifting of the risk of loss to the boatowner.

## B.   Enforceability of Exculpatory Clause

Given the clear and unequivocal limitation in the Winter
Storage Contract on BTB's liability for damages to the boat
owner's property, it is necessary to examine whether public

---

> person or property sustained while in or on the
> facilities of LANDLORD, including fire, theft,
> vandalism, windstorm, high or low waters, hail,
> rain, ice, collision or accident, or any other Act
> of God, whether said boat is being parked or
> hauled by an AGENT of LANDLORD or not.

<u>Sander</u>, 334 F.3d at 714.

6

policy supports restricting such absolution of all liability for
the marina's own negligence and outweighs the liberty to
contract.  Exculpatory clauses are not per se unlawful, and may
be enforced in appropriate circumstances based on "the
consideration that businessmen can bargain over which party is to
bear the risk of damage and set the price accordingly, thus
achieving a more rational distribution of the risk and allocation
of price than the law would otherwise allow." Sander, 334 F.3d at
717 (quoting La Esperanza, 124 F.3d at 19).  In weighing
competing public policy considerations, there is general
agreement among the circuits that the following three factors are
relevant in determining whether to enforce an exculpatory clause
in a marine contract:  (a) the nature of services covered by the
contract; (b) whether the exculpatory clause is being applied to
intentional, reckless, or grossly negligent behavior or rather to
ordinary negligence; and (c) whether the exculpatory provisions
were obtained through overreaching.  See Sander, 334 F.3d at 717,
Royal Ins. Co. of America v. Southwest Marine, 194 F.3d 1009,
1014 (9th Cir. 1999), La Esperanza, 124 F.3d at 19, Edward
Leasing, 785 F.2d at 889.  The test in the First and the Eleventh
Circuits, however, is more restrictive, and would also invalidate
any exculpatory clause seeking to absolve a party of all
liability for its own negligence. See La Esperanza, 124 F.3d at
19; Edward Leasing, 785 F.2d at 888-89.

a.   Nature of the Services

The nature of the services covered by the contract alters
the public policy prism through which exculpatory clauses are
viewed because some relationships may have inherently unequal
bargaining power permitting the taking of unfair advantage,
monopolistic tendencies may be greater in some industries, or
there may be insufficient alternative deterrents to negligence in
certain contexts.   In Bisso v. Island Waterways Corp., 349 U.S.
85 (1955), for example, the Supreme Court invalidated a towage
contract releasing the tower from all liability for its own
negligence on public policy grounds.   The Court noted that such a
rule was "merely a particular application to the towage business
of a general rule long used by courts and legislatures to prevent
enforcement of release-from-negligence contracts in many
relationships such as bailors and bailees, employers and
employees, public service companies and their customers," id. at
90-91, and reasoned that the purpose of the rule was "(1) to
discourage negligence by making wrongdoers pay damages, and (2)
to protect those in need of goods and services from being
overreached by others who have power to drive hard bargains."
Id. at 91.   Applying the rule to the towage context was
appropriate, the Supreme Court found, because of the risks
involved and because "increase maritime traffic of today makes it
not less but more important that vessels in American ports be

8

able to obtain towage free of monopolistic compulsions."  Id.

The Supreme Court distinguished pilotage contracts, in which it

had previously found exculpatory clauses to be valid, see Sun Oil

Co. v. Dalzell Towing Co., 287 U.S. 291 (1932), in part because

pilots, unlike towage employees, operate with a high degree of

independence from the towing company.  The Supreme Court thus

reasoned, "[i]t is one thing to permit a company to exempt itself

from liability for the negligence of a licensed pilot navigating

another company's vessel on that vessel's own power. . . .  It is

quite a different thing, however, to permit a towing company to

exempt itself by contract from all liability for its own

employees' negligent towage of a vessel."  Id. at 94.

Circuits interpreting Bisso have underscored that Bisso's

holding was grounded in a recognition of the unequal nature of

the relationship between towing companies and ships seeking

access to a port, and the otherwise inadequate incentives for

towing companies to use reasonable care.[2]  Thus, while careful to

examine the particularized facts of a defendant's overreaching,

the circuits generally agree that Bisso is limited to towage

---

[2]The Supreme Court in Bisso reviewed in broad terms the
contractual relationship between a towing company and boatowner
and nature of the tugboat industry, but as the Supreme Court
later observed, the Bisso decision "was perforce reached without
consideration of particularized economic and other factors
relevant to the organization and operation of the tugboat
industry."  Southwestern Sugar & Molasses Co. v. River, 360 U.S.
411, 416 (1959).

contracts.   As the Eighth Circuit in <u>Sander</u> explained:

> The doctrine prohibiting a party from completely absolving
> itself from liability for its own negligence is limited to
> circumstances involving relationships similar to towage
> agreements, such as bailment, employment, or public service
> relationships.   The Supreme Court has explained the
> circumstances justifying the limitation of exculpatory
> clauses in those situations as those involving a monopoly or
> unequal bargaining power.   Where the peculiarities of those
> types of relationships do not justify application of the
> doctrine, we uphold the strong public policies of
> recognizing parties' liberty to contract and enforcing
> contracts as written.

334 F.3d at 719.   See <u>also</u> <u>B.H. Morton v. Zidell Explorations,</u>

<u>Inc.</u>, 695 F.2d 347, 351 (9th Cir. 1982) (per curiam) (holding

that an exculpatory clause in a marine repair contract was

enforceable, absent evidence of overreaching, and finding <u>Bisso</u>

limited to towage contracts); <u>Fireman's Fund Am. Ins. Co. v.</u>

<u>Boston Harbor Marina, Inc.</u>, 406 F.2d 917, 921 (1st Cir. 1969)

(remanding to the district court for development of the factual

record on the issue of whether there was overreaching by the

marina, and noting that "the breadth of the Court's language [in

Bisso] does not encourage us to be quick to distinguish it").

   b.   <u>Gross Negligence</u>

   The Circuits considering the issue also agree that "a party

to a maritime contract should not be permitted to shield itself

contractually from liability for gross negligence." <u>Royal Ins.</u>,

194 F.3d at 1016; <u>see</u> <u>also</u> <u>La Esperanza</u>, 124 F.3d at 19-20

(affirming the district court's determination enforcing the

limitation of liability clause in the parties' contract,

10

reasoning while such clauses cannot validly "provide for a total absolution of liability," and "may not limit liability on a marine contract for gross negligence," the liability limitation clause in the parties' contract was enforceable where only ordinary negligence by the shipyard had been proven.); Todd Shipyards Corp. v. Turbine Serv., Inc., 674 F.2d 401, 411 (5th Cir. 1982)("Gross negligence, which will invalidate an exemption from liability, has been defined as '... harm wilfully inflicted or caused by gross or wanton negligence.'") (quoting 6A Corbin On Contracts § 1472 (1964 ed.)).  Such a public policy exception is well-established at common law, see, e.g. Rest. (2d) Contracts § 195(1) & cmt. a (1979) ("A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy. . .  The law of torts imposes standards of conduct for the protection of others against unreasonable risk of harm.  One cannot exempt himself from such liability for harm that is caused either intentionally or recklessly."), and appears based on a recognition that sound public policy requires greater deterrents to gross negligence or intentional misconduct than to ordinary negligence.  Moreover, enforcing an exculpatory clause as applied to a party's gross misconduct does little to aid the freedom of contract, because while businesspersons may reasonably anticipate accidents or ordinary negligence and account for who bears the risk of damage

11

in setting the price of a contract, contracting parties rely on the other's good faith and fair dealing.

    c.  Overreaching

Finally, the circuits are in agreement that exculpatory clauses in marine contracts may not be enforced where there is evidence of overreaching, which is defined as the "act or an instance of taking unfair commercial advantage of another." Black's Law Dictionary (7th ed. 1999).  Where the parties have equal bargaining power, overreaching is unlikely to be found.  In B.H. Morton, for example, the Ninth Circuit found no overreaching evident in the contract reached between boat owners and a marine repair and construction company refurbishing the boat, because the boat owners were "knowledgeable businessmen," and "in signing the contract [they] neither objected to nor mentioned the 'red-letter' clause," and "there was nothing to prevent [the boat owners] from taking their vessel to another yard" two months later, when the boat owners brought their account current and boat conversion resumed. 695 F.2d at 349, 351.  See also Diesel "Repower", Inc. v. Islander Invs. Ltd., 271 F.3d 1318, 1325 (11th Cir. 2001)(finding no overreaching because "the 'businessmen' possessed equal bargaining power upon entering the contract."). Likewise, unequal bargaining power of the parties cannot, in itself, support a finding of overreaching.  See Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 593 (1991).  The test,

rather, is whether the disparity in bargaining power was used to take unfair advantage of a party to the contract.   For example, in Sander, the Eighth Circuit explained that "the mere fact that the contracts were form contracts does not per se lead to the conclusion that the Yacht Club engaged in overreaching," as "[t]here must be some evidence that the party holding the superior bargaining power exerted that power in overreaching the less sophisticated party by, for example, engaging in fraud or coercion or by insisting on an unconscionable clause."   334 F.3d at 720. See also Royal Ins., 194 F.3d at 1014 (holding that the exculpatory clause in a contract for rental of space in a boat yard was not invalid for overreaching, because "[e]ven if [the ship owner] objected to an exculpatory provision during contract negotiations, he ultimately 'assented without complaint.'"); Fireman's Fund, 406 F.2d at 921 (in remanding for consideration of overreaching, noting, "a boatowner who already has a comprehensive marine policy might be pleased to pay a storage rate that did not include any charge for the yard's obligation of reasonable care, but we do not know that all boatowners carry such insurance, or would wish, if they had the choice, to release a yard from responsibility.").

    d.   Total Absolution of Liability

The First and Eleventh Circuits require additionally that parties may not totally absolve themselves of all liability.   The

13

concern here is that the "prospective wrongdoer's 'potential

liability' should be enough to 'deter negligence.'"   Edward

Leasing, 785 F.2d at 888 (quotation omitted); Diesel "Repower",

271 F.3d at 1325; La Esperanza, 124 F.3d at 19.   Thus, in finding

the liability limitation clause enforceable in Diesel "Repower",

the Eleventh Circuit relied on the fact that the clause at issue

did not absolve Diesel of all liability, as Diesel would remain

responsible for "replacing parts free of charge within the

warranty period, refunding the $45,000 purchase price of the

equipment, and going uncompensated for numerous hours of labor

expended on replacement of parts under the warranty or on

original installation."   Id. at 1125.   The total absolution of

liability in the contract between the ship owner and ship

repairer in Edward Leasing, however, rendered the exculpatory

clause unenforceable.

The rule in Edward Leasing and La Esperanza depended on the

assumption that there could be no other alternative deterrents to

negligence, and that the parties themselves could not agree to

allocate the risk of loss from that negligence.   There is reason

to be skeptical of such assumptions, and this Court therefore

declines to adopt such an encompassing rule.   For example, other

factors such as the cost of failing to perform the contract, or

reputational harm, may well provide a sufficient deterrent to

negligence.   In this context, the negligence plaintiff has

14

alleged is distinguishable from the towing company's negligence
in <u>Bisso</u> or the ship repairer's negligence in <u>La Esperanza</u> and
<u>Edward Leasing</u>, as BTB is claimed only to have unreasonably
failed to take proper measures to prevent the vandalism of
plaintiff's boat, and while the vessel was in BTB's custody and
care, it is not claimed that BTB's agents were actively
manipulating the boat.  As the <u>Sander</u> court recognized, a "ship
repairer who takes control of a vessel and enters an agreement to
perform work on the vessel is in a much different situation than
a marina that provides a dock to which numerous boat owners have
access and dock their boats."  <u>Sander</u>, 334 F.3d at 719.

Moreover, this Court concludes that it cannot be determined
as a matter of law that boat owners seeking winter storage are
unable to rationally choose to bear the risk of accident or the
marina's negligence, and carry the appropriate insurance, given
the contractual price for the winter storage.  Thus, any
categorical rule prohibiting or permitting the exculpatory clause
in BTB's Winter Storage Contract is inappropriate.  The public
policy concerns with exculpatory clauses are instead best
channeled into a fact-specific examination of whether BTB engaged
in overreaching, or gross misconduct.[3]  These considerations

---

[3]Plaintiff has not specifically pled "gross negligence," and
"gross negligence has never been recognized in [Connecticut] as a
separate basis of liability in the law of torts." <u>Decker v.</u>
<u>Roberts</u>, 125 Conn. 150, 157 (1939).  Nonetheless, as the degree
of defendant's culpability is highly relevant to the general

require further factual development.  Given the highly

particularized inquiry that therefore must precede any

determination of the enforceability of an exculpatory clause, it

is inappropriate to decide the issue on a Rule 12(b)(6) motion.[4]

---

issues at hand under maritime law and this court's admiralty
jurisdiction, the Court identifies it as a factor without
deciding its applicability to this case.

[4]Plaintiff's argument that he did not receive notice of the
exculpatory clause in the contract also requires further factual
development.  Relevant considerations include, for example,
whether the "physical characteristics" of the contract
"reasonably communicated" the existence of the clause, and "the
circumstances surrounding the [signing of the contract] permitted
the [plaintiff] to become meaningfully informed of the
contractual terms at stake." Ward v. Cross Sound Ferry, 273 F.3d
520, 523 (2d Cir. 2001) (citation and internal quotation marks
omitted).  Here, the signature page of the 2003-2004 Winter
Storage Contract contains the following language:

> We ask that you please read the General Conditions and Yard
> Rules on the reverse side of this contract. . . .  I, the
> undersigned, have read and understand the General Conditions
> and accept all the terms and conditions.

Winter Storage Contract [Doc. # 16, Ex. 2].

Plaintiff states that he received only the front side of the
contract containing the signature page, and never received the
General Conditions page.  Because the signature page clearly
informed plaintiff of the existence of further contractual terms,
it becomes relevant to the notice inquiry whether plaintiff was
afforded sufficient time and opportunity to obtain a copy of the
General Conditions prior to signing the contract.  There is a
further factual dispute as to whether plaintiff was supplied with
General Conditions on a separate sheet of paper.  See Affidavit
of Michael Pendleton, attached to [Doc. # 19] at ¶ 6.

16

## IV.   Conclusion

For the foregoing reasons, defendant's motion to dismiss [Doc. # 12] is DENIED.

IT IS SO ORDERED.

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut, this _27th_ day of June, 2005.

17